IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NASHWA ULSAKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:10-cv-1416 (AJT/TRJ) |
| | ) |
| LINCOLN NATIONAL LIFE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Nashwa Ulsaker's former employer, the Sequoia Management Company, Inc. ("Sequoia") purchased Group Long-Term Disability Insurance Policy No. 000010089052 (the "Policy") from the Jefferson Pilot Financial Insurance Company (which, together with its successor, the Lincoln National Life Insurance Company, shall be referred to as "Lincoln"). The Policy is a benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), and Lincoln acts as the plan administrator.

Plaintiff suffers from chronic headaches and applied for total disability benefits under the Policy. After providing such benefits for an initial 24 month period, based on her inability to perform the required duties of her position with Sequoia, Lincoln denied plaintiff's application for total disability benefits thereafter on the grounds that her condition did not prevent her from engaging in other types of employment. After exhausting her administrative remedies, plaintiff filed this action seeking to obtain such benefits under the Policy. This matter is before the Court on the parties' cross motions for summary judgment,

1

based on the administrative record [Doc. Nos. 16 and 18]. This Court held a hearing on these motions on July 1, 2011, following which it took the matter under advisement.

The Court concludes that Lincoln misinterpreted the applicable provisions of the Policy in determining whether plaintiff was entitled to total disability benefits beyond the initial 24 month "Own Occupation Period." Specifically, Lincoln interpreted the Policy to require plaintiff to establish that her condition prevented her from performing the required duties of any occupation for which she was suited by education, training or experience. The Court concludes, however, that in order to continue to obtain total disability benefits under the Policy after the initial 24 month period, the plaintiff was required to establish only that because of her condition she continues to be prevented from performing the essential duties of her former employment with Sequoia. In this regard, the administrative record does not provide a basis on which to conclude that plaintiff's medical condition, which Lincoln determined caused her to be unable to perform the "Main Duties" of her "Own Occupation" as defined under the Policy, has changed since Lincoln made that determination and that there is no evidence that she would be able to perform those "Main Duties," as defined under the Policy, within the context of any other occupation. For these reasons, as discussed in more detail below, the Court will grant plaintiff's motion for summary judgment, deny Lincoln's motion for summary judgment and remand this matter to Lincoln, with directions to award to plaintiff total disability benefits under the Policy.

## I.   BACKGROUND

Plaintiff is 51 years old and was a well-compensated commercial property management executive with Sequoia from May 1994 through June 2009. Plaintiff has a twelfth-grade education, is a Certified Property Manager and Real Property Administrator,

and has worked in the property management field since 1977. Admin R. at 857. Plaintiff has a long history of chronic headaches; and that she suffers from chronic headaches is not disputed. Plaintiff's condition began with occasional mild headaches during adolescence, but her headaches became progressively more frequent and serious as she reached adulthood. Plaintiff sought treatment from numerous physicians over the years, including psychotherapy treatments to develop strategies for coping with her pain.

Sequoia purchased the Policy in early 2007. The effective date of the Policy was March 1, 2007. Admin R. at 20. On or about September 6, 2007, plaintiff applied for disability benefits under the Policy. In support of her application, plaintiff stated that she was unable to work because "[d]isabling daily headaches made it difficult to do daily tasks and greatly impacted [her] professional and personal abilities to function." Admin R. at 866. Plaintiff also filed a "Physician's Statement" form signed by Dr. Stuart Stark, a neurologist, which stated that plaintiff was "unable to work at all due to daily headaches that interfere with her ability to concentrate [and] attend to tasks." Admin R. at 869. Dr. Stark also attached numerous notes, letters and records reflecting plaintiff's struggle with headaches, including information regarding medications and surgery that failed to resolve her headaches. Admin R. at 870-886.

Based on the information plaintiff submitted, Lincoln approved plaintiff's claim for total disability benefits for the 24 month period ending September 27, 2009. However, Lincoln's letter approving the claim advised the plaintiff that her long term entitlement to benefits would depend on whether she was "disabled from performing any type of work."[1]

---

[1] Lincoln's letter stated in pertinent part:

> Your policy provides 24 months of benefits as long as you are unable to perform the main duties of your Own Occupation, as defined by your policy.

3

In March 2009, Lincoln undertook a review of plaintiff's case, both with respect to her existing disability benefits and future disability benefits after the initial 24 month period of coverage. Based on the administrative record, it appears that plaintiff was advised that Lincoln was initiating a review of her future benefits under the "any occupation" provisions of the Policy by letter dated March 3, 2009. Admin R. at 806-807. It also appears that Lincoln began its review of plaintiff's existing disability benefits no later than March 26, 2009. Admin R. at 797.

With respect to plaintiff's existing benefits, Lincoln, through Tina Walton-Groom, R.N., M.S.N, reviewed plaintiff's case and, based on her conclusion that plaintiff's medical records were "mostly subjective and functional abilities are difficult to establish," recommended that plaintiff's case be referred for a "Neuro Peer Review." Admin R. at 797. In response, Dr. Todd Samuels, a board certified neurologist, reviewed plaintiff's medical records and concluded, based on his review, that plaintiff's "disability cannot be proven to be medically necessary" and that "[t]here are no objective findings to substantiate that the patient cannot work in her own occupation." Admin R. at 794. Based on Dr. Samules' analysis, Lincoln decided to terminate plaintiff's benefits. Admin R. at 900. However, before the termination was effected, Lincoln received additional records from plaintiff's neurologist, Dr. Stark, and referred the matter to Dr. Gary Greenhood. Admin R. at 899-900. Dr. Greenhood also stated that there were "no objective findings that support" the "primary diagnosis" of "chronic daily headache," but found that the medical records did

---

However, after this period your claim will be re-evaluated. Benefits will continue if you are disabled from performing any type of work.

Admin R. at 853.

"show a loss of function that would preclude the claimant from performing sedentary-level work." Admin R. at 770-71. Dr. Greenhood opined that "this claimant's headaches are constant, severe, durable, and refractory to treatment." Admin R. at 771. Based on Dr. Greenhood's conclusions, and the information provided by the plaintiff and her healthcare providers, Lincoln decided to continue paying total disability benefits under the Policy. Admin R. at 899.

With respect to plaintiff's future benefits, Lincoln's letter dated March 3, 2009 requested that plaintiff provide additional information, which all parties agree plaintiff subsequently provided. Lincoln also commissioned additional reviews of plaintiff's case by persons not previously involved in her evaluation. In October 2009, a registered nurse employed by Lincoln reviewed plaintiff's file, found that "there are no medical findings supporting the presence of her head pain" and recommended further neuropsychological testing. Admin. R. at 650-51. Subsequently, Lincoln retained Dr. Gloria Morote, a licensed clinical psychologist and clinical neuropsychologist, who prepared a 23 page report for Lincoln based on the results of plaintiff's two-day set of neurological tests. Admin R. at 617-39. In her report, Dr. Morote opined:

> ... there are indications that Mrs. Ulsaker is fixated on her pain, is somatically preoccupied, has low tolerance for stress, has the propensity to develop physical symptoms under stress, is moderately depressed, has gotten to the point where she believes and/or reports that her pain is refractory to care, and is likely overly focused on her need for support and analgesic medication.
>
> Taking into consideration the current evaluation as a whole, it is my opinion, that Mrs. Ulsaker's cognitive abilities and limitations are not sufficient to remove and preclude the opinion of returning to gainful employment at any occupation that [she] is suited for by education, training and experience.

Admin. R. at 638.

5

Lincoln also obtained a vocational assessment dated December 28, 2009. Adopting the findings contained in Dr. Morote's report rather than conducting an independent review of plaintiff's claimed migraine pain, the assessment concludes that the plaintiff possesses "transferrable skills" that would allow her to work as a real estate manager or sales agent, or in other comparable fields. Admin R. at 568-570. Based on these assessments, Lincoln determined that plaintiff was not totally disabled under the "any occupation" provisions of the Policy. Admin R. at 564-567; Deft.'s Mem. In Supp. of Mot. for Summ. J., at 19.[2]

Plaintiff appealed Lincoln's determination to Lincoln's "Risk Services" group on March 29, 2010. The core of plaintiff's complaint was that the pain associated with her headaches prevents her from being able to function in a work environment on a daily basis. Specifically, plaintiff contended that the fact that she can do some tasks, as necessary, does not outweigh the fact that employers are unlikely to be willing to accommodate a schedule revolving around pain management. Admin R. at 537-540.

On April 27, 2010, Lincoln sent plaintiff a letter in which it denied her appeal. Admin R. at 525-529. The letter stated that Lincoln had sent a copy of plaintiff's file to Dr. LeForce, a physician who is board certified in neurology and clinical neurophysiology, and

---

[2] In its briefing, Lincoln claims that it also undertook another independent medical evaluation of the plaintiff's file on December 28, 2009, and that Dr. Bruce LeForce conducted this review. *See* Def.'s Mem. in Supp. of M. for Summ. J., at 11 (citing Admin. R. at 530-533). The report cited, however, is dated April 16, 2010, and appears to instead have been obtained in connection with plaintiffs' appeals of Lincoln's decision to deny her additional benefits. Admin R. at 530. Moreover, Lincoln's internal notes state that Lincoln determined that plaintiff is not totally disabled for any occupation based on "the file review, TSA and Vocational research" only. Admin R. at 898. Similarly, Lincoln's letter to plaintiff informing her of its decision to discontinue her benefits, dated January 4, 2010, fails to reflect any analysis by Dr. LaForce, and instead cites information submitted by plaintiff's physicians, the R.N.'s October 2009 file review, Dr. Morote's report, and the vocational analysis. Admin R. at 554-557. As a result, this Court shall consider Dr. Leforce's involvement in this matter in its correct context, as discussed below.

adopted Dr. LaForce's findings that, "[b]ased on the normal findings on examination, imaging, and other testing, there is no objective evidence of impairment. No restrictions or limitations are supported by the information provided. She is capable of full time work." Admin R. at 525-532.

On August 30, 2010, plaintiff, through counsel, filed a lengthy second appeal with Lincoln. Admin R. at 110-154. The letter also included, as attachments, statements and letters from plaintiff, her husband, and friends and family, including plaintiff's brother, a professor of medicine. Admin R. at 221-234. In response, Lincoln obtained an evaluation from Dr. Wayne Anderson, who is board certified in neurology and pain medicine. Dr. Anderson reported:

> The physicians have found the claimant to be completely disabled from any occupation to any degree. As discussed, the submitted documentation, which is all that this reviewer may rely upon, does not support this.

Admin R. at 75. The report further concluded:

> Given the failure of treatments that are proven to provide relief of headache, the failure of objective neuropsychological studies to support pathology, and the failure of the MRI to demonstrate the most common finding of chronic headache, the diagnosis of headache itself is brought into question. If headache is present (and the claimant reports that it is) then the consideration of MOH [medication overuse headache] is appropriate.
>
> Whereas pain is subjective and cognitive impairment may be perceived as subjective, the submitted information, as explained above, does not provide the information necessary to establish a determination of disability. Since the claimant has seen well-respected headache specialists, it may be that additional documentation places the claimant in the category of 1.51 – chronic migraine, and if this information exists, it should be forwarded for re-review.

Admin R. at 77-78.

In response to Dr. Anderson's report, plaintiff provided a response from Dr. Stark, in which he strongly criticized Dr. Anderson's findings. Admin R. at 86-89. Dr. Anderson,

7

however, stood by his impressions. Admin R. at 66-69. By letter dated December 17, 2010, Lincoln also stood by its determination to deny plaintiff further benefits under the Policy, based in substantial part on Dr. Anderson's opinions and responses to Dr. Stark's criticisms. Admin R. at 58-64. In relevant part, the letter stated:

> We understand that your client has been diagnosed with headaches. However, our review of the medical documentation ... does not support that your client was unable to perform the main duties of any occupation beyond January 27, 2010...
>
> In summary, we find the medical documentation does not support that there are restrictions and limitations that would render your client unable to perform each of the main duties of any gainful occupation that your client has the training, education, and experience to perform. We therefore find that your client is no longer Totally Disabled under the terms of our policy.

Admin R. at 63.

## II.   ANALYSIS

### A. Standard of Review

Summary judgment is appropriate where there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56..." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011); *Ga. Pac. Consumer Prods., L.P. v. Von Drehle Corp.*, 618 F.3d 441, 445 (4th Cir. 2010) (court reviewing grant of summary judgment must "view the facts and draw all reasonable inferences therefrom in the light most favorable to ... the nonmoving party"). In the context of an ERISA appeal, however, this Court's factual inquiry focuses on the adequacy of administrative record. If the administrative record is inadequate to permit this Court to reach a judgment as a matter of law, this Court must remand the matter to the plan administrator for further proceedings.

*Bernstein v. Capitalcare, Inc.*, 70 F.3d 783, 788-89 (4th Cir. 1995) ("[T]he administrative record must document the decision-making process [of the plan administrator]. If the evidence before the plan administrator is inadequate, the district court should remand the case to the administrator to receive additional evidence and to make a new determination").

Under ERISA, a beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "Although ERISA itself is silent on the standard for denials of benefits challenged under § 1132(a)(1)(B) ... a *de novo* standard applies 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case the exercise of assigned discretion is reviewed for abuse of discretion." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 (4th Cir. 2008) (quoting *Firestone Tire and Rubber Co. v. Burch*, 489 U.S. 101, 111, 115 (1989)). Because the Policy expressly reserves discretionary authority to "establish administrative procedures, determine eligibility and resolve claims questions." Admin R. at 34, Lincoln's decision to deny plaintiff benefits under the Policy is reviewed for abuse of discretion.

In the ERISA context, the Fourth Circuit has discussed the abuse of discretion standard in substantial detail:

> First, in ERISA cases, the standard equates to reasonableness: We will not disturb an ERISA administrator's discretionary decision if it is reasonable, and will reverse or remand if it is not ... Second, the abuse of discretion standard is less deferential to administrators than an arbitrary and capricious standard would be; to be unreasonable is not so extreme as to be irrational ... Third, an administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." ... Fourth, the decision must reflect careful attention to "the language of the plan," as well as the requirements of ERISA itself. One adds new assemblages of words to this legal landscape with caution, but it seems

9

> on the whole that **we require ERISA administrators' decisions to adhere both to the text of ERISA and the plan to which they have contracted; to rest on good evidence and sound reasoning; and to result from a fair and searching process.**

*Evans*, 514 F.3d at 322-23 (emphasis added). "If the denial of benefits is contrary to the clear language of the plan, the decision will constitute an abuse of discretion." *Lockhart v. United Mine Workers 1974 Pension Trust*, 5 F.3d 74, 78 (4th Cir. 1993) (internal citations and quotation marks omitted).

In reaching its decision, this Court may consider the financial interest of an ERISA plan administrator, but that financial interest must be weighed as "one factor among many" in determining whether there is an abuse of discretion, *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008), and "in no case does the court deviate from the abuse of discretion standard." *Evans*, 514 F.3d at 323, fn. 2. Concerns regarding conflicts of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy..." *Glenn*, 554 U.S. at 117. And conflicts of interests that may affect the administrator's paid employees and consultants are not relevant to the Court's analysis. *Abromitis v. Cont'l Cas. Co. / CAN Ins. Cos.*, 114 Fed. Appx. 57, 61 (4th Cir 2004) (affirming order denying discovery regarding the number of contracts between a physician and the plan administrator and the administrator's payments to the physician under those contracts on the grounds that such discovery as irrelevant). However, where, as here, the plan administrator is vested with discretion to interpret the provisions of a plan, "reasonable exercise of that discretion requires that the decision-maker/insurer construe plan ambiguities against the party who drafted the plan." *Carolina Care Plan, Inc. v. McKenzie*, 467 F.3d 383, 389 (4th Cir. 2006); *see also McKeldin*

*v. Reliance Std. Life Ins. Co.*, 254 Fed. Appx. 964, 967 (4th Cir. 2007) (interpreting *Carolina Care* in a case involving a total disability policy).

### B. The Relevant Policy Provisions

Under the Policy, Lincoln agreed to pay disability benefits to qualifying Sequoia employees, including Ulsaker, if such an employee: (1) is "Totally Disabled;" (2) became disabled while insured under the Policy; (3) is under the regular care of a physician; and (4) "at his or her own expense, submits proof of continued Total Disability and Physician's care to [Lincoln] upon request." Admin R. at 40. Critical to the disposition of this case are, among others, the Policy terms "Total Disability," "Totally Disabled," and "Main Duties."

The Policy defines the terms "Total Disability" and "Totally Disabled" as follow:

1. During the Elimination Period and Own Occupation period, it [Total Disability or Totally Disabled] means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.

2. After the Own Occupation Period, it means that due to Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.

Admin R. at 29.[3] "Main Duties" is defined as "those job tasks that [1] are normally required to perform the Insured Employee's Own Occupation, and [2] could not reasonably be modified or omitted." Admin. R. at 26.

In addition, "Own Occupation" is defined as "the occupation, trade or profession: [1] in which the Insured Employee was employed with the Employer prior to Disability; and [2] which was his or her main source of earned income prior to Disability." Admin R. at 27.

---

[3] Sickness is defined as "illness, pregnancy or disease." Admin R. at 28. Injury is defined as "accidental bodily injury that: 1. requires treatment by a Physician; and 2. directly, and independently of all other causes, results in a Disability that begins while the Insured Employee is insured under this Policy." Admin R. at 26. The parties do not suggest, however, that either of these definitions are material to the resolution of this case.

11

The "Own Occupation Period" is defined as "a period beginning at the end of the Elimination Period and ending 24 months later for Insured Employees." Admin R. at 22. The "Elimination Period" is defined as "the number of days of Disability during which no benefit is payable," which, under the Policy, is "90 calendar days of Disability caused by the same or related Sickness or Injury, which must be accumulated within a 180 calendar day period." Admin R. at 22, 25.[4]

The Policy further reserved discretionary authority to "manage this Policy, interpret its provisions, administer claims, and resolve questions arising under it," including the rights to:

1. establish administrative procedures, determine eligibility, and resolve claims questions;
2. determine what information [Lincoln] reasonably requires to make such decisions; and
3. resolve all matters when an internal claim review is requested.

Admin R. at 34.

### C. Lincoln's Interpretation and Application of the Policy

Lincoln's denial of plaintiff's requests for further benefits was based on Lincoln's interpretation of the "any occupation" clause of the Policy. *See* Admin R. at 58-64. Under the provisions quoted above, an insured employee, such as the plaintiff, is "Totally Disabled" after the 24 month "Own Occupation Period" if she is "unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow." Admin R. at 29. As explained in its December 17, 2010 letter denying

---

[4] The Policy also sets forth a series of "Claims Procedures." Admin R. at 32. The Policy requires the insured employee to provide documentation including certain statements by the employee, employer, and attending physician, information regarding the employee, authorization forms, and "any other items [Lincoln] may reasonably require in support of the claim." Admin R. at 32.

12

plaintiff further disability benefits, Lincoln stated the following understanding of the relevant Policy provisions:

> This policy has a 24 month Own Occupation Period which ended on September 27, 2009. In order to be considered Totally Disabled beyond this date, the medical evidence must support that your client would be unable to perform each of the main duties of any occupation for which your client is qualified. As such, in considering your client's eligibility for Long Term Disability benefits beyond January 27, 2010, the date to which benefits were last paid, we evaluated whether your client would be restricted or limited from performing the main duties of any occupation for which your client is qualified.

Admin R. at 58.

Lincoln's interpretation of the relevant Policy provisions was not based on the Policy definition of "Main Duties," which refers to the essential duties of her Own Occupation. Admin. R. at 40. Rather, Lincoln used the term "main duties" to refer to those essential duties of any occupation that the plaintiff was qualified to perform, even if she continues to be unable to perform the core duties of her prior occupation with Sequoia. The Court must therefore determine whether Lincoln denied plaintiff's application for long term disability benefits based on a permissible reading of the Policy's phrase "Main Duties of any occupation." *See Carolina Care Plan, Inc.*, 467 F.3d at 389-90 (holding plan administrator abused its discretion by interpreting ambiguous policy language in manner that rendered policy internally inconsistent, and failing to construe ambiguity against the drafter).

The Policy defines the term Main Duties to mean "those job tasks that [1] are normally required to perform the Insured Employee's Own Occupation, and [2] could not reasonably be modified or omitted." Admin. R. at 26. "Own Occupation" is defined, in effect, as the job plaintiff held at Sequoia before her disability. Admin R. at 27. Substituting the defined meaning of "Main Duties" into the phrase "Main Duties of any

13

occupation" leads to somewhat of a linguistic challenge.[5] Nevertheless, the only reasonable reading of the phrase "Main Duties of any occupation," based on the Policy definition of "Main Duties," is that in order for plaintiff to continue to receive disability benefits after the 24 month period, her disability must continue to prevent her from performing the essential duties of her former occupation at Sequoia before the onset of her disability, even within the context of some other occupation. In other words, the Policy, as written based on its defined terms, only requires that, in order to receive total disability payments after the initial 24 month period, plaintiff is unable to perform the essential duties of her prior occupation with Sequoia, even when those same essential duties are transferred to another occupation.

The Court concludes that this language in fact creates a coherent, if not artfully drafted, definition of disability after the Own Occupation Period. Specifically, this Court concludes that the dispositive question is whether, after the expiration of the Own Occupation Period, plaintiff is able to perform the core job tasks of her pre-disability employment within the context of any occupation which her training, education or

---

[5] Replacing the defined terms in the phrase "Main Duties of any occupation" with their definitions as stated in the Policy, the operative Policy definition of "Total Disability" after the initial 24 month Own Occupation Period based on the "any occupation" provision, would read essentially as follows:

> ...it [Total Disability] means that due to an Injury or Sickness the Insured Employee is unable to perform each of [those job tasks that [1] are normally required to perform the Insured Employee's [occupation, trade or profession: [1] in which the Insured Employee was employed with the Employer prior to Disability; and [2] which was his or her main source of earned income prior to Disability], and [2] could not reasonably be modified or omitted][,] of any occupation which his or her training, education or experience will reasonably allow

Admin R. at 26-27, 29.

experience will reasonably allow. This construction, unlike the interpretation ostensibly relied on by Lincoln, adheres to both the definition of Main Duties as well as the express language of the "any occupation" clause without rendering the clause to be incomprehensible or reading the defined term Main Duties out of the clause. This conclusion is also consistent with this Court's obligation to resolve ambiguities in the language of the Policy against the drafter. *See Carolina Care Plan, Inc.*, 467 F.3d at 389-90.

As reflected in Lincoln's initial letter awarding benefits for the initial 24 month period, warning that the plaintiff's benefits would not continue beyond 24 months unless she was "disabled from performing any type of work," Admin R. at 853, Lincoln failed to recognize and apply the defined term Main Duties within the context of the "any occupation" clause. The interpretation Lincoln did adopt in denying plaintiff further benefits substituted a meaning for the phrase "Main Duties of any occupation" that imposed far more stringent requirements for long term disability benefits than those imposed by the defined terms of the Policy. Specifically, because of Lincoln's misreading of the Policy, Lincoln denied plaintiff benefits based on its determination that plaintiff "would have the capacity to perform any sedentary level occupation" and that she had "the capacity to work." Admin R. at 62-63. Lincoln failed entirely, however, to make any findings regarding plaintiff's ability to perform the core job tasks of her pre-disability employment, or her ability to perform those same core job tasks in some other occupation that her training, education or experience will reasonably allow. This failure is particularly striking in light of Lincoln's prior determinations based on Dr. Greenhood's evaluation in March 2009, never disclaimed or repudiated by Lincoln, that plaintiff's disability, in fact, entitled her to total

disability benefits during the initial 24 month Own Occupation Period. That determination necessarily included a finding that plaintiff was "unable to perform each of the Main Duties of his or her Own Occupation." Admin R. at 29.

Nor is there any evidence in the record that plaintiff's headache problems were resolved or even improved from her condition at the time Lincoln determined in June 2009 that she was eligible to receive total disability benefits during the initial 24 month period. Rather, Lincoln terminated her benefits under the "any occupation" clause on the grounds that her condition did not preclude her from working in sedentary occupations, without any determination, or even suggestion, that she could resume performance of the essential tasks of her prior occupation with Sequoia. In short, Lincoln's decision to terminate plaintiff's total disability benefits was not based on a permissible reading of the Policy and therefore did not rest on "good evidence" and "sound reasoning." *Evans*, 514 F.3d at 322-23 (administrator's "decision must reflect careful attention to 'the language of the plan'"); *Carolina Care Plan, Inc.*, 467 F.3d at 389-90.

Based on the administrative record, the Court also concludes that the plaintiff continues to suffer from the same condition that caused Lincoln to determine her eligible for total disability benefits during the initial 24 month period and there is no evidence that her condition has materially changed such that she can now perform her essential duties of her former occupation with Sequoia before the onset of her disability, either at Sequoia or with some other employer. For these reasons, the Court will order Lincoln to award plaintiff long term disability benefits under the Policy for the period after the initial 24 month Own Occupation Period through the date of this Order, to the extent that such benefits have not

already been paid, and until such time as plaintiff may no longer be entitled to such benefits under the Policy.

### III.   CONCLUSION

For the above reasons, plaintiff's Motion for Summary Judgment [Doc. No. 16] will be granted, Lincoln's Motion for Summary Judgment [Doc. No. 18] will be denied, and the Clerk shall be directed to enter judgment in favor of plaintiff and against Lincoln. Any application for attorney fees and costs shall be filed within fourteen (14) days of the date of this Order.

An appropriate Order will issue.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
September 30, 2011